1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NORA MANNI,

                            Plaintiff,

        v.

CITY OF SAN DIEGO, et al.,

                            Defendants.

CASE NO: 11-CV-0435W (DHB)

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' SUMMARY-
JUDGMENT MOTION [DOC. 46]

Pending before the Court is Defendants City of San Diego and Officer Salvador Hurtado's summary-judgment or, in the alternative, summary-adjudication motion [Doc. 46]. Plaintiff Nora Manni opposes.

The Court decides the matter on the papers submitted and without oral argument under Civil Local Rule 7.1(d)(1). For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion [Doc. 46].

I.    BACKGROUND

On June 6, 2010, Plaintiff Nora Manni was in San Diego attending the wedding of her best friend, Peggy Kulato, as the maid of honor. After the wedding, Ms. Manni,

the newlyweds, and a group of friends went to a local Pacific Beach bar called "Moondoggies."

The bride's brother, Fourat Kulato, was not allowed to enter Moondoggies because of an issue with his identification.  At some point, Ms. Manni alleges that one of the bar's bouncers pushed him.  When the groom attempted to intervene, three or four bouncers tackled the groom, handcuffed him, and one of the bouncers punched him in the face.  A member of the wedding party then called 911.

At approximately 10:58p.m., Defendant Police Officer Salvador Hurtado and his partner, Officer Mike Sylvester, were dispatched to Moondoggies.  (*See Galipo Dec.* [Doc. 49-1], Ex. 7 (the Dispatch printout) [Doc. 49-8], p.1.)  Dispatch reported that one of the bouncers may have assaulted a male.  (*Hurtado Dep.*, 15:25–16:8.[1])

Upon arriving, the officers noticed a group of people outside Moondoggies yelling at the bar staff.  (*Hurtado Dep.*, 23:1–2; *Sylvester Dep.*, 9:4–11.[2])  One of the bouncers was holding the groom face down on the ground with his hands handcuffed behind his back.  (*Hurtado Dep.*, 23:7–22.)  Officer Sylvester approached, helped the groom to his feet, and began walking him toward the patrol car to find out what happened.  (*Sylvester Dep.*, 13:3–20, 14:1–7.)  Officer Hurtado stayed back about 6 or 8 feet observing the crowd.  (*Hurtado Dep.*, 25:2–10.)

When Ms. Kulato, the bride, saw Officer Sylvester walking with her husband, she thought he was being arrested so ran toward them and began trying to talk to Officer Sylvester.  (*P. Kulato Dep.*, 61:19–23.[3])  The officer told Ms. Kulato several times that she

---

[1] Portions of Officer Salvador Hurtado's deposition ("Hurtado Dep.") are attached to Defendant's List of Evidence [Doc. 46-2] as Exhibit 5 [Doc. 46-7], and to Dale Galipo's Declaration as Exhibit 2 [Doc. 49-3].

[2] Portions of Officer Michael Sylvester's deposition ("Sylvester Dep.") are attached to Defendant's List of Evidence as Exhibit 6 [Doc. 46-8], and to Dale Galipo's Declaration as Exhibit 3 [Doc. 49-4].

[3] Portions of Ms. Kulato's deposition ("P. Kulato Dep.") are attached to Defendant's List of Evidence as Exhibit 2 [Doc. 46-4].

could not come with them. (*Id.*, 61:24–62:1.)  However, Ms. Kulato ignored Officer Sylvester and continued to follow. (*Id.*, 62:3–8.)  Ms. Kulato also testified that as she followed them, she kept "grabbing my husband's arm so that I could go with both of them." (*Id.*, 83:20–22.)

Officer Hurtado believed Ms. Kulato was attempting to interfere with Officer Sylvester, and intervened. (*Hurtado Dep.*, 28:11–16.)  He stepped in front of Ms. Kulato, put his arms on her shoulders, and said "really firmly you cannot go there[.]" (*P. Kulato Dep.*, 62:14–18.)  Ms. Kulato, who was crying, pleaded with Officer Hurtado to let her follow Officer Sylvester and her husband, but Officer Hurtado again told her "no, you can't go there." (*Id.*, 62:22–25.)  Ms. Kulato ignored him and "proceeded to go there." (*Id.*, 62:25–63:4.)  Officer Hurtado then "pulled [her] away," put one of his arms on the "mid range" of her body (i.e., by her stomach), and pushed her back. (*Id.*)

As Officer Hurtado was focused on Ms. Kulato—and members of the wedding party and bouncers exchanged verbal hostilities—Ms. Manni ran toward Officer Hurtado and, while putting her hand on his shoulder, loudly told him not to push the bride because she was pregnant. (*P. Kulato Dep.*, 64:14–65:1; *Manni Dep.*, 74:14–75:25.[4])  According to Ms. Manni, she had to speak loudly to Officer Hurtado because of the chaos. (*Manni Dep.*, 74:20, 75:3–4.)  Officer Hurtado immediately told Ms. Manni she was under arrest, took hold of her left wrist, and he began pushing her towards the nearby patrol car. (*Id.*, 76:23–77:10.)  As he moved Ms. Manni toward the car, Officer Sylvester observed men approaching and called for more officers. (*Sylvester Dep.*, 26:16–23.[5])  Officer Hurtado also called for additional officers. (*Hurtado Dep.*, 56:4–6.)

---

[4] Portions of Plaintiff Nora Manni's deposition ("Manni Dep.") are attached to Defendant's List of Evidence as Exhibit 3 [Doc. 46-5], and to Dale Galipo's Declaration as Exhibit 1 [Doc. 49-2].

[5] There are a numerous problems with Defendants' citations to evidence.  Specifically, certain pages of deposition transcripts were not included with the exhibits.  For example, pages 62, 83, 84, 99, 116, 117 to Officer Hurtado's deposition transcript, cited in support of "undisputed fact" numbers 58–61 (*see Def.s' Sep. State* [Doc. 46-1]) are not included in Exhibit 5.  Page 31 of Timothy Walter's deposition, page 42 of Deniz Guraydin's deposition, and certain

1    When Officer Hurtado and Ms. Manni reached the car, Officer Hurtado pushed
2  Ms. Manni up against the car, put her left arm behind her back and handcuffed her left
3  wrist. (*Manni Dep.* 77:25–78:5.) While handcuffing her, Ms. Manni testified that Officer
4  Hurtado "was pushing my face pretty much against the trunk [of the patrol car and], I
5  was saying ouch or something like that." (*Id.*, 79:24–80:1.)  After her right wrist was
6  handcuffed, Officer Hurtado placed Ms. Manni in the backseat of the car. (*Id.*, 83:4–11.)

7    While Officer Hurtado was handcuffing Ms. Manni, he felt a pop in her upper
8  arm and suspected that he may have broken it. (*Hurtado Dep.*, 84:3–9, 86:6–8, 97:1-11.)
9  Once Ms. Manni was placed in the back of the patrol car, she realized her arm was
10  broken because she was in pain. (*Manni Dep.*, 85:25–86:6.) However, while in the back
11  of the car, she did not try to say anything or alert anyone to the fact that she was injured
12  or in pain. (*Id.*, 86:9–16.)

13    After placing Ms. Manni in the back of the car, Officer Hurtado contacted his
14  supervisor because he believed Ms. Manni was injured. (*Hurtado Dep.*, 97:1–11.) He
15  then called for paramedics and asked a female officer who had arrived on scene, Officer
16  Vanessa Holland, to check Ms. Manni's arm. (*Id.*, 97:16–22.)

17    Approximately 5 to 10 minutes after Ms. Manni was put in the car, Officer
18  Holland arrived to talk to her. (*Manni Dep.*, 87:1–8.) Ms. Manni told Officer Holland
19  that her "arm is killing me" and an ambulance arrived approximately three to five
20  minutes later. (*Id.*, 87:15–88:2.) The ambulance transported Ms. Manni to the hospital,
21  where she was diagnosed with a broken arm.

22

23

24  _____

pages of Officer Sylvester's deposition are missing.  To the extent the Court has cited these pages,
25  it is because Ms. Manni included them in her opposition.

    The Court is also troubled by Defendants' citation to Ms. Kulato's deposition transcript
26  as evidence that members of the wedding party charged Officer Hurtado. (*See Def.s' Sep. State.*,
27  Fact No. 42.) The citation is to a portion of a question Ms. Kulato was asked, and Defendants
    fail to include the portion of the transcript that includes her answer.  It should be obvious to
28  counsel that the attorney's question, absent Ms. Kulato's response, is not evidence that the men
    charged Officer Hurtado.

## II.  LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir.

1995) (citing <u>Anderson</u>, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.").  Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Celotex</u>, 477 U.S. at 324 (<u>quoting</u> Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  <u>See Matsushita</u>, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  <u>Anderson</u>, 477 U.S. at 255.

**III.   DISCUSSION**

**A.      The undisputed facts establish that Officer Hurtado had probable cause to arrest Ms. Manni.**

"Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime."  <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 471 (9th Cir. 2007) (citing <u>Dubner v. City & Cnty. of San Francisco</u>, 266 F.3d 959, 966 (9th Cir. 2001)).  Probable cause to arrest is based on an objective standard.  <u>U.S. v. Lopez</u>, 482 F.3d 1067, 1072 (9th Cir. 2007).   Thus, "[p]robable cause exists when, at the time of arrest, the agents know reasonable trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense."  <u>Allen v. City of Portland</u>, 73 F.3d 232, 237 (9th Cir. 1995); <u>Aguilera v. Baca</u>, 394 F. Supp. 2d 1203, 1214 (C.D. Cal. 2005) ("Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense.") (internal quotations and citation omitted).

1    The "standard of probable cause 'applies to all arrests, without the need to

2  'balance' the interests and circumstances involved in particular situations.'" <u>Atwater</u>

3  <u>v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001).  Thus, "if an officer has probable

4  cause to believe that an individual has committed even a very minor criminal offense

5  in his presence, he may, without violating the Fourth Amendment, arrest the

6  offender." <u>Id.</u>

7    Here, Defendants argue that Officer Hurtado had probable cause to arrest Ms.

8  Manni for violation of California Penal Code §§ 242, 243(b) and 148.  Section 242

9  prohibits the "willful and unlawful use of force or violence upon the person of

10  another."  Section 243(b) provides that a battery "committed against the person of a

11  peace officer . . . engaged in the performance of his or her duties" is punishable by a

12  fine and/or imprisonment not exceeding a year.  Section 148 prohibits a person from

13  "willfully resist[ing], delay[ing], or obstruct[ing] any . . . peace officer . . . in the

14  discharge or attempt to discharge any duty of his or her office."

15    Ms. Manni argues that disputed issues of material fact exist regarding whether

16  there was probable cause to arrest her.  Specifically, Ms. Manni contends the

17  following disputes exist:

18    1.    Ms. Manni never jumped in between Officer Hurtado and Ms. Kulato,

19          but instead walked up to Officer Hurtado and slightly touched him on

20          his shoulder to get his attention as he was forcefully pushing the

21          pregnant bride.  (*Opp.* [Doc. 49], 14:6–10, citing Fact No. 117.[6])

22    2.    Ms. Manni did not yell at Officer Hurtado, but instead "calmly told

23          Officer Hurtado to not push the bride because the bride was pregnant."

24          (*Opp.*, 14:12–14, citing Fact No. 119.)

25

26

_____

27    [6] Although Ms. Manni contends that she "walked" up to Officer Hurtado, this fact is not
    mentioned in Plaintiff's Fact No. 117.  (*See* Pl.'s Resp. Sep. State. [Doc. 48], No. 117.)  Nor does

28  Ms. Manni's Opposition cite any evidence supporting the contention.  Additionally, Ms. Kulato
    testified that she "saw Nora run to both of us . . . ." (*P. Kulato Dep.*, 64:15.)

3.     Ms. Manni did not grab Officer Hurtado's arm and push it away, but instead "only slightly touched Officer Hurtado on his left shoulder to get his attention as he was forcefully pushing the pregnant bride." (*Opp.*, 14:16–19, citing Fact No. 117.)

4.     Ms. Manni did not interject herself in Officer Hurtado's police investigation because: (1) he was not conducting an investigation, but instead was performing crowd-control responsibilities and manhandling Ms. Kulato; and (2) her slight touching constituted, at most, a de minimus interference with his duties. (*Opp.*, 14:20–28, citing Fact Nos. 22 and 117.)

5.     The only person approaching Officer Sylvester was Ms. Kulato. (*Opp.*, 14:12–14, citing P. Kulato Dec., ¶ 6.)

The Court is not persuaded by Ms. Manni's arguments for two reasons.

First, Ms. Manni's contention that Officer Hurtado was not discharging his duties when she touched him is absurd. The undisputed facts establish that when Ms. Manni touched Officer Hurtado, he was attempting to stop Ms. Kulato from interfering with Officer Sylvester's discharge of his duties. Ms. Kulato testified that when she ran to Officer Sylvester and her husband, Officer Sylvester told her, "you can't come over here, you can't come over here, you can't come over here." (*P. Kulato Dep.*, 61:24–62:1.) Rather than comply with Officer Sylvester, Ms. Kulato testified that she

> would reply to him please, again, you have the wrong guy, you have the wrong guy; and then I heard another cop saying he might get arrested. I just vaguely heard that, and that's when I went again towards them, I like ran towards them again.

(*Id.*, 62:3–8.) At that point, after repeatedly ignoring Officer Sylvester, Ms. Kulato testified that "Officer Hurtado came to block me from going. His body literally was like in front of me, and he put his arms on my shoulders, and he said really firmly you cannot go there[.]" (*Id.* 62:15–18.) She admitted, however, that even after Officer Hurtado told her that she could not follow Officer Sylvester and her husband, Ms.

        11cv435w

1    Kulato ignored Officer Hurtado and tried to follow them, at which point Officer

2    Hurtado grabbed her:

3        I looked at [Officer Hurtado], and I was crying, and I said please, help me,
         he's not the guy that you guys want, please, this our wedding night, I'm
4        pregnant, I just want my husband with me. I said, I just want to be with
         him, can you guys question him while I'm with him, **and he was very firm**
5        **with me, and he said, no, you can't go there. So I again proceeded to go**
         **there,** and he pulled me away, and then he put his arms at me like he put
6        one arm of his on my body, like on my mid range of my body, so where my
         stomach would be, he pushed me back.
7    (*Id.*, 62:18–63:4, emphasis added.)

8        Ms. Kulato's testimony establishes that she was "willfully . . . delay[ing], or

9    obstruct[ing]" Officer Sylvester in the discharge of his duties. Indeed, Officer Hurtado

10   testified that he believed Ms. Kulato was attempting to stop Officer Sylvester from

11   escorting the groom away from the group. (*Hurtado Dep.*, 28:11–16.) Accordingly, in

12   attempting to stop Ms. Kulato from advancing on Officer Sylvester and her husband,

13   Officer Hurtado was clearly engaged in the discharge of his duties.

14       Second, based entirely on Ms. Manni's version of events, Officer Hurtado had

15   probable cause to arrest her. Ms. Manni admits that she touched Officer Hurtado's

16   left shoulder for the specific purpose of getting his attention while he was attempting

17   to stop Ms. Kulato. (*See Pl.'s Resp. Sep. State.*, No. 117, *citing Manni Dep.*, 75:22–76:22.)

18   The simple touching of Officer Hurtado constitutes a battery and violation of Penal

19   Code §§ 242 and 243(b). Moreover, given the chaos, with approximately six male

20   members of the wedding party arguing with the bouncers, Ms. Manni's decision to

21   touch Officer Hurtado's left shoulder to shift his attention away from Ms. Kulato

22   confirms probable cause to arrest Ms. Manni for willfully attempting to obstruct or

23   delay Officer Hurtado's performance of his duties, a violation of section 148. (*Manni*

24   *Dep.*, 64:12–65:22; *Pl.'s Resp. Sep. State.*, No. 21, (clarifying that "any 'verbal hostilities'

25   were between members of the wedding party and the bouncers, and were not directed

26   at police."); *Hurtado Dep.*, 15:14–16, 21:6–7, 23:1–2, 24:9–20.)

27       In light of these circumstances, the Court easily concludes that Officer Hurtado

28   had probable cause to arrest Ms. Manni when she "touched" Officer Hurtado's

1   shoulder in attempt to draw his attention away from the performance of his duties.

2   Accordingly, Defendants are entitled to summary adjudication on Ms. Manni's

3   unlawful arrest claim.

4

5           **B.       Ms. Manni was not denied reasonable post-arrest medical care.**

6           Defendants seek summary adjudication of Ms. Manni's claim for the denial of

7   medical assistance.  Claims for the denial of medical assistance are analyzed under the

8   Fourth Amendment.  Tatum v. City and Cnty. of S.F., 441 F.3d 1090, 1098–99 (9th

9   Cir. 2006) (explaining that Fourth Amendment applies to such claims).  The Fourth

10  Amendment requires officers to provide objectively reasonable post-arrest care to an

11  apprehended suspect.  Id. at 1099.

12          For example, in Tatum, officers placed the handcuffed suspect on the ground,

13  and laid him on his side.  After officers noticed that the suspect's eyes were bulging

14  and his breathing was heavy, they called for an ambulance.  While waiting for the

15  ambulance, the suspect's breathing became shallow so the officers sent a second radio

16  message requesting that the ambulance be given priority.  When paramedics arrived,

17  the suspect was no longer breathing and the suspect was pronounced dead.  In the

18  Section 1983 action that followed, the suspect's mother argued that the officers

19  should have performed CPR. The Ninth Circuit disagreed:

20              [T]he critical inquiry is not whether the officers did all that they could have
                done, but whether they did all that the Fourth Amendment requires.  Here,
21              the officers promptly requested medical assistance, and the Constitution
                required them to do no more.  [Citation omitted.]  We hold that it was
22              objectively reasonable for Officers Smith and Chan to request an
                ambulance for Fullard, rather than performing CPR themselves.
23  Tatum, 441 F.3d at 1099.

24          Ms. Manni contends that she was denied appropriate post-arrest medical care

25  because Officer Hurtado "waited approximately ten minutes until he finally

26  summoned medical attention." (Opp., 26:4–7.)  Similar to plaintiff's claim in Tatum,

27  Ms. Manni's claim appears premised on the contention that Officer Hurtado could

28  have done more (i.e., acted quicker) in obtaining medical care.  But Tatum clearly

stands for the proposition that the Fourth Amendment does not require officers to do everything possible, but instead to act objectively reasonable. Based on the undisputed facts, the Court finds Officer Hurtado provided objectively reasonable care in obtaining medical care for Ms. Manni within 15 minutes.

First, although Officer Hurtado immediately believed he may have injured Ms. Manni, she did not react to her arm breaking in such a way as to suggest she needed urgent medical care. According to Ms. Manni, while Officer Hurtado "was pushing my face pretty much against the trunk [of the patrol car and], I was saying ouch or something like that." (*Manni Dep.*, 79:24–80:1.) She then noticed that Officer Hurtado took longer to handcuff her right wrist, but she did not know why. (*Id.*, 83:4–11.) But she did not say anything or react to the pop in her arm, which Officer Hurtado felt. (*Hurtado Dep.*, 84:3–9, 86:6–8.) Ms. Manni further testified that it was not until she was placed in the back of the patrol car that she realized her arm was broken. (*Manni Dep.*, 84:9–11, 85:25–86:6.) However, she did not say anything or try to alert anyone to the fact that she was injured. (*Id.*, 86:9–16.) Accordingly, while Officer Hurtado knew he had injured Ms. Manni, her reaction did not suggest that urgent medical care was needed.

Second, the undisputed facts also establish that when Ms. Manni's arm broke, Officer Hurtado believed the scene was getting out of hand and, therefore, was not only confronted with having to contact paramedics. Ms. Manni described the scene as chaotic, with approximately six male members of the wedding party engaged in "verbal hostilities" with three or four bouncers. (*See Pl.'s Resp. Sep. State.*, No. 21, (stating "'verbal hostilities' were between members of the wedding party and the bouncers[.]"); *Manni Dep.*, 64:12–15, 64:25–65:22.) The officers were also confronted with Ms. Kulato's interference, and the men approaching Officer Hurtado as he was arresting Ms. Manni. (*See Pl.'s Resp. Sep. State.*, Nos. 43, 44; *Sylvester Dep.*, 26:16–23.) The officers' urgent call for additional units is evidence that they felt the situation was becoming unstable. (*See Sylvester Dep.*, 26:16–23; *Hurtado Dep.*, 56:4–6.) Thus,

1   although Officer Hurtado thought he had injured Ms. Manni, there is no dispute that

2   he also believed that he needed to calm the scene.  (*Hurtado Dep.*, 49:22–25.)

3        Third, Ms. Manni testified that approximately 5 to 10 minutes after she was

4   put in the car, Officer Holland arrived to check on her.  (*Manni Dep.*, 87:1–8.)

5   Approximately three to five minutes later, the ambulance arrived.  (*Id.*, 87:15–88:2.)

6   Given Ms. Manni's delayed reaction to her break, and the chaotic scene the officers

7   faced when Ms. Manni was arrested, the Court concludes that Officer Hurtado acted

8   objectively reasonable by securing medical attention for Ms. Manni within 15 minutes

9   of the time she was arrested.

10        For these reasons, the Court will grant Defendants' motion with respect to Ms.

11   Manni's claim for the denial of medical treatment.

12

13       **C.**     **Factual disputes exist regarding Ms. Manni's excessive-force claim.**

14        In determining whether an officer used excessive force, courts consider "the

15   nature and quality of the intrusion on the individual's Fourth Amendment interests

16   against the countervailing governmental interests at stake."  Graham v. Connor, 490

17   U.S. 386, 396 (1989).  Courts examine the nature of the crime, the threat to officers,

18   whether the suspect resists arrest, the amount of force used to arrest, the availability

19   of alternatives to the amount of force used, and the mental and emotional state of the

20   plaintiff.  See Davis v. City of Las Vegas, 478 F.3d 1048, 1054-57 (9th Cir. 2007);

21   Deorle v. Rutherford, 272 F.3d 1272, 1282 (9th Cir. 2001).  Although a court views

22   evidence in the light most favorable to the non-moving party in summary judgment,

23   "[t]he 'reasonableness' of a particular use of force must be judged from the perspective

24   of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

25   Graham, 490 U.S. at 396.  The applicable standard is "whether the officers' actions

26   are 'objectively reasonable' in light of the facts and circumstances confronting them,

27   without regard to their underlying intent or motivation."  Id., at 397.

28

1   Here, Defendants' argument that Officer Hurtado did not use excessive force is
2   premised on the contention that Ms. Manni resisted arrest.  Specifically, Defendants
3   argue that Ms. Manni "struggled and tried to pull away from Officer Hurtado," and
4   that she "ignore[d] [his] orders to give him her left arm." (P&A [Doc. 46], 13:14–21.)
5   According to Defendants, "Officer Hurtado's use of force in response to Plaintiff's
6   *Active Resistance* and *Assaultive Behavior* was within the San Diego Police
7   Department's Use of Force Procedure 1.04 and reasonable." (*Id.*, 13:23–25.)
8   But Ms. Manni has provided evidence that contradicts Defendants' claim that
9   she resisted and attempted to kick Officer Hurtado.  During Ms. Manni's deposition,
10   she denied attempting to pull away or struggle with Officer Hurtado, and stated that
11   she repeatedly told him that he was hurting her. (*Manni Dep.*, 78:21–79:16.)  She also
12   denied attempting to kick him. (*Id.*, 127:18–23.)  Joel Reveles, another member of
13   the wedding party who was at Moondoggies during the arrest, stated that Ms. Manni
14   never attempted to pull away from Officer Hurtado, was compliant with his attempts
15   to handcuff her, did not resist or do anything "at all to move away or avoid being
16   handcuffed," and that "Ms. Manni never kicked Officer Hurtado or attempted to kick
17   Officer Hurtado." (*Reveles Dec.* [Doc. 49-13], ¶¶3–13, 15.)  Flora Manni, Plaintiff's
18   sister, repeated these statements. (*See F. Manni Dec.* [Doc. 49-12], ¶¶ 4–14, 16.)
19   Defendants' and Ms. Manni's version of events concerning her arrest differ
20   significantly.  Because on summary judgment the Court may not weigh evidence or
21   resolve factual disputes, Defendants' request for summary adjudication of Ms.
22   Manni's excessive-force claim is denied.

24   **D.   Qualified Immunity**

25   Defendants also seek summary adjudication based on qualified immunity.
26   "The doctrine of qualified immunity protects government officials 'from liability for
27   civil damages insofar as their conduct does not violate clearly established statutory or
28   constitutional rights of which a reasonable person would have known.'" Pearson v.

1    Callahan, 555 U.S. 223, 231 (2009).  "Qualified immunity balances two important

2    interests–the need to hold public officials accountable when they exercise power

3    irresponsibly and the need to shield officials from harassment, distraction, and

4    liability when they perform their duties reasonably." Id.

5         In evaluating qualified immunity, the Court must evaluate two issues.  First,

6    whether the facts show the violation of a constitutional right.  Saucier v. Katz, 533

7    U.S. 194, 201 (2001).  Second, whether the right was "clearly established" at the time

8    of defendant's misconduct.  Id.  "Qualified immunity is applicable unless the official's

9    conduct violated a clearly established constitutional right."  Pearson, 555 U.S. at 232.

10

11        **1.     Qualified immunity applies to Ms. Manni's claims for lack of**

12               **probable cause and denial of medical attention.**

13        In light of the finding that Officer Hurtado had probable cause to arrest Ms.

14   Manni and provided her with reasonable post-arrest medical care, the Court finds Ms.

15   Manni has failed to establish a violation of a constitutional right with respect to these

16   claims.  Accordingly, Officer Hurtado is entitled to qualified immunity with respect to

17   Ms. Manni's claim for lack of probable to arrest and the denial of medical attention.

18

19        **2.     Disputed issues of fact exist with respect to Officer Hurtado's**

20               **request for qualified immunity for the excessive-force claim.**

21        Defendants argue that Officer Hurtado is entitled to qualified immunity with

22   respect to Ms. Manni's excessive-force claim.  Defendants concede that the

23   constitutional right at issue was clearly established at the time of Ms. Manni's arrest,

24   but argue that it was objectively reasonable for Officer Hurtado to believe his conduct

25   was lawful at the time.  (*Reply* [Doc. 50], 5:6–8.)

26        But Defendants' argument is based on the contention that Ms. Manni "actively

27   resisted and attempted to assault Officer Hurtado."  (*P&A*, 16:4–6.)  As set forth

28

1 | above, numerous disputed issues of fact exist regarding Ms. Manni's conduct.
2 | Accordingly, summary adjudication is not appropriate with respect to this claim.

3 |

4 | **E.** **Summary adjudication is appropriate with respect to Ms. Manni's**
5 | ***Monell* claim.**

6 | Defendants seek summary adjudication with respect to Ms. Manni's *Monell*
7 | claim.  In response, Ms. Manni has agreed to withdraw the claim.  (*See Opp.*, 31:1–3.)
8 | Accordingly, summary adjudication of Ms. Manni's *Monell* claim is appropriate.

9 |

10 | **F.** **Summary adjudication is appropriate with respect to Ms. Manni's**
11 | **claims for false arrest, and certain negligence claims.**

12 | Defendants seek summary adjudication with respect to each of Ms. Manni's
13 | state claims.  With respect to Ms. Manni's false arrest, battery, and negligence claims,
14 | the parties' arguments essentially repeat the arguments addressed above regarding Ms.
15 | Manni's section 1983 claims.  Accordingly, for the reasons already stated above, the
16 | Court rules as follows on the state claims:

17 | (1)   Because Officer Hurtado had probable cause to arrest Ms. Manni, the
18 |       Court will grant Defendants' request summary adjudication of her claim
19 |       for false arrest and negligence (to the extent it is based on the lack of
20 |       probable cause).

21 | (2)   Because Ms. Manni was not denied reasonable post-arrest medical care,
22 |       the Court will grant Defendants' request for summary adjudication of
23 |       her negligence claim (to the extent its based on the failure to provide
24 |       adequate medical care).

25 | (3)   Because disputed issues of material fact exist regarding whether Officer
26 |       Hurtado used excessive force to arrest Ms. Manni, summary adjudication
27 |       is not appropriate with respect to her claim for batter or negligence (to
28 |       the extent its based on the force used to arrest her).

1   **G.    Ms. Manni has failed to produce evidence that she suffered severe**
2        **emotional distress.**

3        Defendants seek summary adjudication of Ms. Manni's claim for intentional

4   infliction of emotional distress.  To prevail on this claim, Ms. Manni must establish:

5   (1) outrageous conduct by the Defendants; (2) their intent to cause or reckless

6   disregard of the probability of causing emotional distress; (3) Ms. Manni suffered

7   severe or extreme emotional distress; and (4) actual and proximate causation.  Galvez

8   v. Kuhn, 933 F.2d 773, 779 (9th Cir. 1991).  For conduct to be extreme and

9   outrageous, it must be "so extreme as to exceed all bounds of that usually tolerated in

10  a civilized community."  Cervantez v. J.C. Penney Co., 24 Cal.3d 579, 593 (1979).

11       Here, Defendants raise two arguments regarding this claim.  First, Defendants

12  argue that Officer Hurtado's "actions do not rise to the level of outrageous conduct or

13  recklessness within the meaning of the law."  (*P&A*, 24:6–7.)  In support of this

14  argument, Defendants contend that "Officer Hurtado had probable cause to arrest

15  [Ms. Manni] and used reasonable force to effectuate the arrest and overcome her

16  resistance."  (*Id.*, 24:16–18.)  Because disputed issues of material fact exist regarding

17  whether Officer Hurtado used excessive force to effectuate Ms. Manni's arrest, this

18  argument is not persuasive.

19       Second, Defendants argue that Ms. Manni "has neither alleged nor submitted

20  facts to sustain" a finding that she suffered severe emotional distress.  (*P&A*,

21  24:23–24.)  The Court agrees.

22       In opposition, Ms. Manni states in her declaration that "I suffered severe

23  emotional distress as a result of this incident."  (*Manni Dec.* [Doc. 49-10], ¶ 28.)  "A

24  declaration is too conclusory to be cognizable when it 'state[s] only conclusions, and

25  not 'such facts as would be admissible in evidence.'"  Corkill v. Preferred Employers

26  Grp., *LLC*, 2011 WL 5975678 (S.D. Cal. Nov. 28, 2011) (citing United States v.

27  Shumway, 199 F.3d 1093, 1104 (9th Cir.1999).  When a "declaration state[s] only

28  conclusions, and not 'such facts as would be admissible in evidence," a court may

1  disregard the self-serving declaration for purposes of summary judgment. <u>S.E.C. v.</u>

2  <u>Phan</u>, 500 F.3d 895, 909 (9th Cir. 2007).

3       Ms. Manni's declaration is insufficient because the statement that she "suffered

4  severe emotional distress as a result of this incident" is conclusory and she fails to

5  identify any supporting facts.  For example, there is no indication that Ms. Manni has

6  had problems sleeping since the incident, has seen a psychologist as a result of the

7  incident, or any other fact suggesting she suffered emotional distress.  Because Ms.

8  Manni identifies no facts and cites no evidence suggesting that she suffered emotional

9  distress, summary adjudication is appropriate as to this claim.

10

11       **H.**    <u>**Disputed issue of material fact exist regarding Ms. Manni's Bane Act**</u>

12            <u>**claim.**</u>

13       Defendants seek summary adjudication of Ms. Manni's claim under California

14  Civil Code § 52.1(b), the Bane Act.  In support of this claim, Defendants argue that

15  the elements of a Section 52.1 excessive-force claim are essentially identical to those of

16  a Section 1983 excessive-force claim.  (*P&A*, 25:19–20, citations omitted.)

17  Accordingly, for the reasons stated above, the Court finds disputed issues of material

18  fact exist with respect to Ms. Manni's Bane Act claim.

19

20  **IV.**    <span style="font-variant:small-caps">**Conclusion & Order**</span>

21       For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES**

22  **IN PART** Defendants' motion [Doc. 46], and **ORDERS** as follows:

23       (1)    Summary adjudication is **GRANTED** as to Plaintiff's 1st claim

24            for Unreasonable Search and Seizure – Detention and Arrest (42 U.S.C.

25            § 1983);

26       (2)    Summary adjudication is **GRANTED** as to Plaintiff's 3rd claim for

27            Denial of Medical Care (42 U.S.C. § 1983);

28

1  (3)   Summary adjudication is **GRANTED** as to Plaintiff's 4th claim for
2        Municipal Liability for Unconstitutional Custom, Practice, or Policy (42
3        U.S.C. § 1983);
4  (4)   Summary adjudication is **GRANTED** as to Plaintiff's 5th claim for False
5        Arrest/False Imprisonment;
6  (5)   Summary adjudication is **GRANTED** as to Plaintiff's 7th claim for
7        Negligence, to the extent it is based on the lack of probable cause to
8        arrest and the denial of medical care; and
9  (6)   Summary adjudication is **GRANTED** as to Plaintiff's 8th claim for
10       Intentional Infliction of Emotional Distress.
11 The motion is **DENIED** as to all remaining issues.
12 **IT IS SO ORDERED.**
13
14 **DATE: November 25, 2013**
15                                          _____
16                                          HON. THOMAS J. WHELAN
                                           United States District Court
17                                          Southern District of California
18
19
20
21
22
23
24
25
26
27
28